Good morning and welcome to the Ninth Circuit sitting in Phoenix. I'm Bridget Beatty and as many of you know, this is my home city. So my chambers are here and I'm very pleased today to be sitting with Judge Susan Graber from Portland and Judge Richard Tolman from Seattle, now by way of Coeur d'Alene, Coeur d'Alene, Idaho. This morning we have two cases to argue. The others have been submitted. The first is Royston v. City of Scottsdale, case number 24-6530. And counsel, whenever you're ready to proceed. Good morning, Your Honor. May it please the Court, my name is Sherry McCracken and I have with me today Kimberly Eckert and Lisa Abishan and my client, Nicole Royston. I would like to reserve five minutes, if I may. We are here today because the District Court erred in finding that Ms. Royston was not a qualified disabled individual. Furthermore, that if she was a qualified disabled individual, she could not do the essential functions of the job, which were attendance. The attendance that was necessary was a day and a third a month. There were four days a month that were court days for what? Photo enforcement. Counsel, wasn't the overarching problem, though, the irregular attendance because of all of the medical appointments and illnesses and so on? As I read the record, basically she was only working about half of the work year of 2080 hours. Well, but that's federally protected leave. She had FMLA leave and then she was out. That's not the thrust of my question, though. It has to do with the employer is entitled to have an employee who regularly attends work. And because of all of her issues, she was unable to do that. So if that's the reason that the employer cites for determining that she's unable to do the job that they need done, where's the violation? The problem is that the long-term leave for childbirth and for the tumor and the cancer had all taken place and the cancer was now in remission. And then the last two times, and you'll notice that the statement of facts has double charges, Ms. Royston, for leave. It says she had some absences between January of something in March 3rd, and then it says she had absences between February 17th and March 30th. Those overlap, so they were counted twice. But the other thing is that the employer knew that the absences that they held against her after they had given her the photo enforcement job were she had a tooth problem and she had a reaction to a COVID vaccine. Neither of those are long-term or because of her disability. Let me tell you what — As I understood the record, there were timeliness concerns with regard to the discharge of some of these duties. For example, in the vehicle impound, there's a state law that says that, you know, you have to provide some sort of an administrative hearing so that people can get their cars back. And in the photo enforcement, if you don't process the photos within a set period of time, you have to dismiss the citation. Yes, Your Honor, I think you're right. But first of all, the city closed the towing window every Friday and at all lunches. So they're saying that they always had to have someone there. Then they had it unmanned for 20 days. Wasn't there an issue with regard to you need a certain amount of training in order to be — so you can't just put anybody on an emergency basis in those positions. You need somebody who's qualified and trained to do that job. Right, and the city knew about these coming retirements. Nicole had told them over and over again that two people were not enough to staff it. They deliberately didn't have anyone trained until such time as she was the only person in the unit. Counsel, I think our precedent says that the FMLSA and the ADA don't require the employer to allocate resources differently or in essence hire more people to do the job. That's a little further than Congress authorized the law to go. Well, what I would say is that good management is good management. And we know that the ADA allows reassignment, assignment to vacant jobs, restructuring. And what they're saying here really is that for a day and a third on their speculation that she had a perceived disability that would prevent her attendance and that — But it's more than just — I guess where you and I are crossing one another is it's more than just attendance. It's the ability of the employer to backfill the position with somebody who's qualified to do that work if she's not able to be there. And that's the problem that I'm focusing on here. Okay, but it's their problem. They had months and years to train other people. And then with the photo enforcement one, after they gave her the job, they withdrew the job. They didn't fill that job for a year. Counsel, I'd like to ask a slightly different question, if I might, and that is what is the adverse employment action? Your client was not dismissed. She was given a light-duty desk job and eventually separated from the police department for medical reasons. And so being continuously employed but simply denied a transfer to a preferred position, why is that an adverse action? It's an adverse action because they had her apply. They hired her for that position. They sent out a memo to everybody in the entire police department that she had the job, and she was the only person that applied. And then humiliatingly, they said she didn't have the job. So embarrassment is, I mean, basically I'm hearing your argument being that being embarrassed by the turn of events, of not getting the transfer that she expected, leaving aside whether it was justified to make that decision, is that an adverse employment action within the meaning of these statutes? I believe so, and I believe that Muldrow supports that. Muldrow basically tells us that an adverse employment action really isn't very high or very much. And in the retaliation, we have Burlington, which says anything that would prevent another complainant from coming forward or might adversely affect them is an adverse employment action for retaliation. I would ask that this court – Is that so even if there's an explanation that is not embarrassing? In other words, the employer's explanation here for the decision was business-related. And I know that you think that's pretextual, but doesn't that affect your assertion that this was humiliating in some way? I don't think so. I mean, everybody tells us that Nicole was a stellar employee, that everybody liked her, that her superiors liked her, that she did a marvelous job. All the more reason that an explanation that there was a business reason for this change would not have affected people's view of her. They've got a two-week window here. Is there evidence in the record of other people being, as you say, humiliating your client? In ways, yes. I would look at the Statement of Facts, the Controverting Plaintiff's Statement of Facts, and if you'll just bear with me for a minute, let me tell you what Lieutenant Piazza said about the job we're talking about. Remember that D. Piazza, who's like two levels up, contacted Nicole's fiancé and said, have her apply for this job. I think it's great for her. Nobody ever said reasonable accommodation. Nobody ever said anything. Wait, before you go on, can you clarify a point? Your brief says that the plaintiff didn't request an accommodation, but the complaint says that she did. So are you saying that she requested an accommodation, a reasonable accommodation, and it wasn't allowed, or that she never requested an accommodation? Basically, what we're saying is under the ADA as amended, the criteria is that reasonable accommodation and an interactive process is necessary, and there's an obligation for one when an employee asks or when there is knowledge that there may be a need. And so are you saying both of these apply? She asked and there was knowledge, or she didn't? She never used the words reasonable accommodation, and I think the case law is clear that she doesn't have to use magic words. I thought the employer offered her a transfer to the patrol aid position. Without discussing it with her and without entering into an interactive process. They made lots of decisions about what her disability allegedly was, what they perceived it to be, what it wasn't. I thought I read in the record some testimony that they were going to take the job description and sit down with her and go through each line of the job description and say in light of whatever your medical condition is, can you stand out in the hot sun directing traffic for 30 minutes? Basically, what they did is they stepped aside. They put her in patrol, her supervisor in patrol, put her on a 30-day desk duty, at which time she applied for light duty. Let me read this back to you, okay? This is what D. Piazza, contacted plaintiff's fiancé, Jim Noland, to advise him of an opening in photo enforcement unit because he felt that position would be a good fit for plaintiff. The assignment allowed for greater flexibility, including work from home, flexible schedules, no window customer service requirements, and minimal in-person obligations. The photo enforcement job was something that we discussed during our meeting with Dawn for additional flexibility. But outside of the court dates and your court prep dates, there's a bit of flexibility because you can do a little work from home, you could come in early, you could stay late. There's no customer service. Does she need an accommodation where she works remotely or is she able to work in the office? She's able to work remotely. Not remotely. I mean, my question is, is that an accommodation that she required or required at the time or could she work at the office? She could work at the office, but the photo enforcement job didn't require that she work at the office and even suggested that they work remotely. Most of it could be done remotely. Except for the days when she needed to be in court. Okay, and again, we have an absolute failure of the employer's obligation to enter into the interactive process. They decided that she couldn't be. The court dates require her what? To authenticate the photos so that they're admissible against the driver. Okay, we're talking about one and a third days a month. We're talking about nobody ever went to her or the court and said, how can we do this if you are absent on court days? She never got to do the job, so nobody knows whether she would be absent on those court days. You don't deny that there might be days when court was being held that for medical reasons she might not be able to come to court. True, but that happens to you and I too. Well, yeah, but that's where I get back to the earlier questions I asked you about whether or not there were people available that could cover for her, and I think the answer was no. It was a very limited number of people who were trained to do that kind of work, and so if she couldn't come to court that day, the city might lose all those citations because there would be no witness to authenticate the evidence. There is 60 days on each photo enforcement ticket authorization, but the other thing is that the city has proven that they could have covered because they didn't fill the position. There were two other people in the unit. They were hiring her as a third, and then when they took the job away from her, they never hired the third at all for the next year. Therefore, proving that the court times could be covered. Also, no one even discussed virtual, and I understand that court as judicial notice can be taken here. We all appear virtually in court over and over and over again. In fact, I had a Ninth Circuit argument where Judge Schroeder appeared virtually, so nobody ever explored how those one-and-a-half days could be covered, whether she could trade with another employee, and they knew all about her absences when they offered her the job and advertised to the entire police department that... So, Ms. McCracken, you're over time now, and you wanted to reserve. What did you ask for, three minutes? I asked for five, but I'm at 40 seconds. You're at 47 seconds over. The clock hit zero. It's going back up. So I will give you a couple of minutes on rebuttal. Okay. Thank you, Your Honor. May it please the Court, my name is Lori Davis. With me at counsel table is Attorney Stephanie Heisner. Together, we represent the city of Scottsdale. I'd like to first address a couple of misstatements made by my opposing counsel before I get started with the bulk of my argument. The first is that... Can I? I'm sorry to interrupt you.  Can I ask you to stay close to the microphones, please? Yes. When you move, we lose you. The microphones aren't very sensitive. My apologies. I thought my voice was too bolsterous. I was shying away from it. So the first misstatement is from Ms. McCracken, is that there were double charges on her leave. That's incorrect. Those are two separate calculations. And even if they were double charges, those were admitted facts, and so they are the facts as below. But they're not. They were different calculations for different time periods. As to the question of Lt. D. Piazza's statement to Mr. or Detective Nolan about the availability of the photo enforcement job, D. Piazza, what's critically important in this case is the timeline of events and what happened when. At that point, that was around December of 2020. Lt. D. Piazza was coming off of the August 2020 vacation discussion, wherein Ms. Royston was expressing she wanted more flexibility. She wanted more time off. Those were vacation discussions. She was out on surgery leave. There was no reason for them to believe that she would not return to work full time, as she did, with no restrictions. And at that time, he's offering some flexibility for her to have a three-person unit as opposed to a two-person unit to give her some of that. He specifically states, if the court would, again, review his statement, he specifically states that there's a little bit of flexibility, there are some opportunities to work from home, but, of course, we need people in court for court days. That is the undisputed record. And further, as far as a virtual court hearing, that's nothing in the record. I don't think that there's any potential for virtual court hearings in photo enforcement with tickets, at least at the time that it was happening. That's simply unknown. It's not in the record that counsel brought that up. But the undisputed facts here are that this was a staffing decision made by responsible management to meet statutory requirements and customer service obligations, just as Judge Tallman suggested earlier in the questioning. In the critical timeframe at issue here, which I believe is February 17, 2021, which is the day after she was placed on the PEU transfer list, to the end of March when the decision was made to transfer her out of vehicle impound, plaintiff did not work 41% of the time. She took nine and a half days of leave out of 23 days of work, all while having been released to work full time with no restrictions. Simultaneously, as this court has already recognized, the units had lost personnel due to retirements, photo enforcement had a backlog of photo enforcement tickets and had to enforce laws, especially related to the problem we were having with drag racing and fatalities in the city at the time, and the vehicle impound window had been closed due to plaintiff's unpredictable last-minute call-outs. This prevented people from getting their cars, and that's something that affected operations at the PD. Now, on top of all of that, it was reported that plaintiff had two surgeries upcoming. That was in the flyer that the plaintiff admitted that she proofed and approved of before it was released. She had two surgeries upcoming. So management was responsible to try to figure out a solution of how to keep the units functioning. So the decision was made to transfer her out of vehicle impound. To be clear, plaintiff did not want to stay in vehicle impound. She admitted that at Statement of Fact 154 and 213. She wanted to go to photo enforcement or to a station officer position, but she could not meet the essential functions of those positions of in-person attendance. So she was assigned to patrol. Where in the record can we find that in-person attendance was an essential function of the position? I understood plaintiff's argument to be that Lieutenant DiPiazza's comments are the basis for saying this could be done remotely. Is there anything else? Is there a job description? Is there something that we can look to to determine if in-person attendance is an essential function? Yes, absolutely, Your Honor. Judge Beatty, at Statement of Fact 28, which is at ER 109 and 37, I'll give the plaintiff Statement of Fact ER after the defendant, regular, reliable attendance for all city employees was required. That was admitted. Defendant's Statements of Fact 9 through 16. Wait a minute. Regular attendance does not say in-person. That's a separate question. You're correct, Judge Graber. Okay, so. Yes, sorry. I guess a continuation of Judge Beatty's question. Yes, and you are correct. That was just part of the attendance requirement overall. But one of the most critical functions of vehicle impound was in-person window hearings. That's Defendant's Statements of Fact 9 through 16, ER 107 and 36. Defendant's Statement of Fact 18 through 22, it was standard operating procedure to have two people in court. That's at ER 108 and 36. Statement of Fact 118 and 119 sets forth the photo enforcement unit requirements. That's at ER 121 and 42. Then at Defense Statement of Fact 6 through 8, the plaintiff disputed the in-person requirements of the job description but then came forward with no evidence to controvert it, and that's a large part of the problem with the plaintiff's case here. We had 277 statements of fact, and by my count, about 48 were disputed. Of those disputed facts, plaintiff came forward with no evidence to contradict it, which is her burden to do when facing summary judgment. So there were in-person requirements for court hearings. The plaintiff admitted there were in-person requirements for both vehicle impound as the window hearings and for photo enforcement to go to court to process the tickets and prosecute the tickets. So, and remember at this time, we were going from a three-person unit and a two-person unit, the three-person photo enforcement, two-person vehicle impound. We had a retirement in photo enforcement and then a retirement in vehicle impound, and that left two photo enforcement people and one vehicle impound person, which was Ms. Royston. Ms. Royston not being there leaves two people in photo enforcement to do everything, be in court, cover the window, and we had two people we needed in court, which made it an impossible position, and the window had to be closed. We have flyers from at least two times that they had to put up a flyer at the last minute because they didn't have enough people to staff the window and go to court. So it unquestionably was a part of the job. And actually, the in-person requirements, as far as being an essential function, the reason for these positions was the appearance at the window, was the appearance in court. There were other things or other duties, of course, that the employees had to do, but the whole purpose was with vehicle impound was to give people their cars back, and the way you do that is through a hearing. Would you direct your attention to the question I asked counsel on the other side, and that is the question of adverse employment action. Is there any evidence that in the desk job that Ms. Royston had at the end, she was paid less or had fewer benefits or unpleasant working conditions or anything that would demonstrate adverseness? No, Judge Graber. There was no evidence that she was treated worse. She was able, when she was reassigned, to pick her location and her shift. The evidence below was that the only thing she could possibly point to would be her work hours and where she had to go to report to work, which is a short distance away from the two different stations, District 2 and District 3, for her desk job. Well, she wanted District 3, didn't she? And she got District 3. She got what she wanted. She got the shift she wanted. She got the location she wanted. And the chiefs told her, look, we will double up on shifts. If there's already somebody in that position, you can do it just so you can have the freedom and the flexibility you need to take your medical appointments and to get better. Is there any evidence to support counsel's theory in her opening argument that the rescission of the earlier job caused humiliation or other adverse reactions from coworkers or supervisors? Certainly not. The only evidence that there is is that plain of herself felt embarrassment. I think the evidence is overwhelmingly in favor of being supportive of Ms. Royston, caring for her, being concerned for her, and wanting her to do well. I mean, she was a well-liked employee. And as far as I understand, I want to be sure that I'm reading the claims and the record correctly. There is no claim here that her eventual separation from the department was involuntary or it was discriminatory in and of itself. Am I right about that? You are correct about that. She simply ran out of leave. And when she ran out of leave, the city covered her for, I think, about a month's worth of gap pay to allow her to get to long-term disability. So there was never an instance where she was denied any FMLA protective, denied any leave, other than her preferred vacation dates back in 2020. I think there was maybe one time she said that she didn't get a day off she wanted. So there's just no evidence of that. And eventually she missed so much work that she ran out of vacation leave, sick leave, unpaid leave, COVID leave, what have you, and went into the gap period where she was provided that additional leave. I also want to point out that as far as an accommodation to Ms. Royston, plaintiff admits in her reply brief that her only request for an accommodation was that she needed to be near a bathroom and make a few doctor's appointments. That's at page 23. But she got that. The first time that she ever mentioned that she needed to be near a bathroom, she admits was at the chief's meeting on May 4 of 2021. That's the first time it was brought to their attention. And immediately she was given the desk job. So to the extent that's even an accommodation, which I think under the ADA, I don't think it really qualifies, but certainly there's been no proof that it qualifies. But she was given it regardless, and she was never denied an opportunity to take her leave. She never worked a day on patrol on the streets. She went straight to a desk job immediately upon making it clear that she had some difficulties. But plaintiff's point, I think, is that if the employer could tell that she needed an accommodation, they had an obligation to explore that. And no one even explored whether there was a possibility for, say, virtual appearances at court or to make a remote work environment work. How do you respond to that? Well, number one, I don't think that, number one, there wasn't a suspicion on the part of the employer that she was disabled under the ADA. What the employer knew was that she didn't feel well and that she was taking a lot of leave. She was missing a lot of work. The only thing she had ever told any person in management was to Alex Restucia, her manager, telling him that she felt nausea at some points. But she admits the only time she shared her condition with her employers was during the chief's meeting on May 4 when she said, I need to be near a bathroom. And certainly they had no reason to suspect that she had a substantially limiting disability to limit a major life activity. Because let's remember, she was released to work full duty with no restrictions by her doctors during all the relevant time frame here. And so there was really no reason for the employer to expect that she needed an accommodation. She certainly never asked for one. But they nevertheless wanted her to be able to, if she felt she needed to take leave, take the leave you need. If you're not feeling well, don't come to work. But is that a disability under the ADA? I don't believe that it is. And I think that considering something like that to be a disability would put an onerous burden and an improper burden, frankly, on the employer to have to dig further into every employee's, oh, she's not feeling well today, well, I should get a doctor's excuse, or I need to get her medical records. That would be invasive. So really there's a burden on the plaintiff to let the employer know, to let the city know, that there's some problems with what she's done. And she never did that. She never asked for an accommodation. And, in fact, when the city went through the interactive process, as her light duty was expiring, she reiterated, I don't need an accommodation. And I take it they never actually had the opportunity to go through the job description line by line as they were talking about doing in the meeting. That's correct, Mr. Toman. They attempted to do that. They sent a list of her job duties. They had her supervisor present, scheduled for a meeting. And she was so alarmed that something's wrong, they're coming after me. She refused to participate in the process and said, I don't need an accommodation. And so I don't think there ever was a meeting that ever went forward where they went line by line through the process. So I think in this case it's clear that the district court gave every benefit of the doubt to Ms. Royston, gave her every reasonable inference. We had undisputed facts in total. The only thing that Ms. Royston had to rely upon was her speculation and her beliefs, which would never be admissible in court. And the district court zealously guarded Ms. Royston's right to a full trial. But at the end of the day, there was nothing for a jury to find, no fact to find, and the defendant, City of Scottsdale, was entitled to judgment as a matter of law. For that reason, we ask that you affirm. Thank you. First of all, I think we're referring to the wrong law. It's not the ADA. It's the ADA as amended. Congress made very clear that they wanted things covered and overruled in specific language many of the precedents of the courts. One of the things it says is that cancer is a disability, is a disability of a major activity. It also says that whether it's in remission or not, it still is a qualified disability. Secondly, we talk about cross-training. I have a memo here from March 2022 that says cross-training and performing vehicle empowerment hearing officer's function in a backup capacity. So all of those people were supposed to have been cross-trained. Also, one of the things that we've missed here is that- Wait a second. That was after the 2021 time period we're talking about, was it? 22 is when the email comes out. Right, which is after the relevant time period. But there still was supposed to be cross-training. Nicole was cross-trained. Rustica says she talked about cross-training at SER 409.  So your argument is that they formalized it in 2022, but they had the obligation in 2021. They certainly had the obligation. And I would refer the court to XB versus Stolle. The ADA, as amended, focuses on compelling behavior of the employer, compelling it to act in a certain way. It is not a retroactive law. It is a law that requires interactive conversation. And what you heard over and over here is that they failed to ask. But just because they failed to ask didn't mean they didn't know. One of the statements- What do we make of the fact that she didn't attend the meeting where they were going to actually start to engage in the process and go through the job description to find out whether or not she was capable of doing each of the items? Well, that was purely speculative that that was what they were doing. They never called it reasonable. Well, it's speculative on her part. Yes, they speculated. We have testimony in the record as to what they were going to do at the meeting. Well, they said they were going to do at the meeting. We also have in the record that- Well, we have the job descriptions in the record, and we have the testimony that they were going to go through them at that meeting. And your client decided not to attend because she got achy. Although we also have in the record, and this is disputed facts, and let's not just talk about admitted facts. Let's talk about genuine material facts. Counsel, I guess the concern I have is that the process has to be interactive, meaning both sides have to-  They needed to ask. And Slavin walked into a meeting, according to Rustica, and Rustica thought they were going to talk about what Nicole could do and not to, and Slavin said, no, she's out of here. She's done. The other thing that my esteemed counsel has done is conflate two jobs. The photo enforcement job did not have a window. That was one of the reasons DPIAZA thought that she'd do well in that job. Because the window here is for getting the cars out of Amtrak, right? Yeah, the window was the towing section. It's the attendance at court that's the key factor with the photo enforcement. Right, and like- Otherwise you lose the ticket. Really, at the time that DPIAZA recommended the photo enforcement position and the time that she went through the entire hiring procedure, all of the people in the management at the city of Scottsdale thought she could do the job. So two weeks later, we have Slavin walk in and say, no, not going to happen. When she asks for the photo enforcement job again, Slavin says, well, that's not going to happen. There was no ADA process. Actually, if you read the records, someplace the city of Scottsdale, they have a form. You would have thought that somebody would have handed her a form. The only time they talk about interactive process is- I'm sorry to interrupt. My time's up. You're almost three minutes over. So if you want to wrap up quickly, but- Can you see the clock from where you are? Yeah. Okay. I don't look at it because I look at you and I apologize. Well, we were asking you questions, but if you want to just close, we're over time. Okay. The judge erred when she found she wasn't a qualified individual. Under the ADA as amended, she clearly is a qualified individual. There was no interactive process. When they decided unilaterally in a meeting that Nicole was not at that she could not do leave and that she would miss so much that this was an essential function of the job. Twelve hours a month is basically what she was supposed to do in court, and nobody ever explored if there was another way to do that. The further proof is that they never hired anybody to do that. So how could it have been essential if for the next year they never fill it? Thank you for your time and patience. I appreciate it. Thank you. Counsel, thank you both for your arguments this morning and these cases submitted.
judges: GRABER, TALLMAN, BADE